In re PRICE CHOPPER SUPERMARKETS, INC., Debtor.

Ralph O. BOLDT, Trustee for Price Chopper Supermarkets, Inc., Plaintiff,

v.

ALPHA BETA COMPANY and Bank of America National Trust and Savings Association, Defendants.

And Related Cross-Actions.

Bankruptcy No. 81–01837–M7.
Adv. No. 82–1624–M7.

United States Bankruptcy Court, S.D. California.

June 13, 1984.

---

Frederick Martin, Jr., Christison, Martin & Oggel, San Diego, Cal., for Trustee, Ralph O. Boldt.

Paul M. Weil, L. Scott McClanahan, Weil & Fritz, Whittier, Cal., for defendant Alpha Beta Company.

George W. Coombe, Jr., General Counsel, Bank of America, Los Angeles, Cal., for defendant Bank of America.

## OPINION ON: MOTION FOR SUMMARY JUDGMENT

LOUISE DeCARL MALUGEN; Bankruptcy Judge.

Price Chopper Supermarkets, Inc. ("Price Chopper" or "Debtor"), a discount retail grocer, purchased certain grocery inventory from Alpha Beta Company ("Alpha Beta"), executing a $125,000 promissory note in favor of Alpha Beta on February 19, 1981. To assure payment of this promissory note, Alpha Beta requested and received a $125,000 standby Letter of Credit from the Bank of America ("Bank") on February 28, 1981. The Letter of Credit provided that at any time up to May 15, 1981 the Bank had an irrevocable obligation to pay Alpha Beta $125,000 upon presentation of a sight draft, the February 19 promissory note from the Debtor, and a statement from Alpha Beta that the Debtor's note was in default.

To assure the Bank's reimbursement in the event it was called upon to perform under the Letter of Credit, on March 3, 1981, Debtor authorized the Bank to debit its checking account in the amount of $2,000 per day.

Commencing March 5, 1981, the Bank deducted $2,000 per day from Debtor's account and transferred the debited sums to its "Bancontrol/Price Chopper" account. These deductions continued until April 13, 1981, with a total of $78,000 having accumulated in the Bancontrol account by that date.

On April 14, 1981, a substitute arrangement for assuring the Bank's repayment was entered into between Debtor and the Bank. The Debtor's president's wife, Marion Jacobs, lent the Debtor 1,012 shares of AT & T common stock to be pledged as collateral for the Debtor's obligation to the Bank. Ms. Jacobs executed a "Security Agreement: Lent Collateral" ("Lent Collateral Agreement") which authorized the borrower (the Debtor) to deliver the stock to the Bank and grant the Bank a security interest in the stock for "any present or future indebtedness" of debtor to the Bank. On the same date, Ms. Jacobs and the debtor executed a "Security Agreement: Secured Party In Possession" ("Security Agreement"), granting the Bank a security interest in the stock.

On April 15, 1981, the Bank sent Alpha Beta a $78,000 cashier's check, together with a letter that stated:

> "These funds are to be applied toward the note that you hold drawn by Price Chopper Supermarkets, Inc. If you are in agreement, *the negotiation of this check will reduce the exposure of Bank of America under the Letter of Credit issued to you* as the beneficiary in the original amount of $125,000 to $47,000.

If you are not in agreement with the above, please return the cashier's check." (*emphasis added*)

On April 15, 1981, the Bancontrol/Price Chopper account was debited for $78,000. On May 15, 1981, an amendment to the Letter of Credit was executed between the Bank and the Debtor, reducing the Letter of Credit from $125,000 to $47,000, and extending the expiration date of the Letter of Credit to September 15, 1981. By telegram dated May 29, 1981, the Bank informed Alpha Beta of the amendment to the Letter of Credit.

On June 16, 1981, the debtor filed a petition for reorganization under Chapter 11. On August 6, 1981, Alpha Beta wrote to the Bank, declaring a default under the promissory note of February 19, 1981, and demanding payment on the Letter of Credit. Subsequent to the demand, the Bank sold the AT & T stock, and sometime between the period of August 17 and 20, 1981, realized $57,818.86 for the shares. Thereafter, the Bank remitted $47,000 to Alpha Beta and the balance to Ms. Jacobs.

## ISSUES

The Trustee has moved for summary judgment on his complaint against Alpha Beta and the Bank, and cross-motions have been made by Alpha Beta for summary judgment in its favor on the Trustee's complaint or, in the alternative, on its crossclaim for indemnity against the Bank. Likewise, the Bank has made a cross-motion for summary judgment. The following issues are presented by the Trustee's summary judgment motion and the crossmotions of Alpha Beta and the Bank:

1. Was the April 15, 1981, payment of $78,000 by the Bank to Alpha Beta a preference to Alpha Beta, voidable under 11 U.S.C. Section 547(b)?

2. Was the AT & T stock property of the estate,

   a. the proceeds of which should be turned over by the Bank to the Trustee under Section 542;

   or,

   b. the proceeds of which are recoverable from Alpha Beta as a post-petition transfer under Section 549?

## DISCUSSION

I. *Preference Issue.*

■ The Trustee's complaint alleges a cause of action for preference only as to Alpha Beta and the Trustee's summary judgment motion is likewise limited to that issue. Alpha Beta has made a cross-motion for summary judgment against the Trustee or, in the alternative, against the Bank for indemnity. After reviewing all arguments and pleadings, the Court grants Alpha Beta's motion for summary judgment against the Trustee.

The Trustee contends that Alpha Beta was an unsecured creditor and that the payment to Alpha Beta was a transfer of the Debtor's funds in payment of an antecedent debt. As support for this proposition he points out that the Ban-Control/Price Chopper account was debited $78,000 on the date the Bank issued a cashier's check to Alpha Beta in the same amount.

Alpha Beta correctly contends that the source of the funds for its payment is irrelevant. Alpha Beta had two debtors—Price Chopper and the Bank. Alpha Beta received payment from the Bank on the Bank's irrevocable obligation to it and acknowledged a reduction of the Bank's liability to Alpha Beta by cashing the Bank's $78,000 check. Indeed, the Bank's April 15 letter to Alpha Beta underscores the fact that the payment was meant to reduce the Bank's liability to Alpha Beta:

"... [T]he negotiation of this check will *reduce the exposure of Bank of America under the Letter of Credit issued to you* as the beneficiary...."

As stated in the *In re Clothes, Inc.,* 35 B.R. 489 (D.N.D.1983) case cited by Alpha Beta:

"Cases decided since 1979 have been unanimous in the decision that letters of credit represent an irrevocable obligation by the issuing bank to the beneficiary

and that this obligation is an independent contractual obligation to pay the beneficiary from the bank's own assets." (*citations omitted*)

The court in that case declined to find that the beneficiary of a letter of credit received preference. This Court is compelled to agree.

Letters of credit are widely used as guaranty devices:

"In recent years instruments operating as letters of credit (in that they operate to create an absolute obligation upon presentation of specified documents) and termed "stand-by" to distinguish them from the traditional letters of credit have been used as security devices in a variety of contexts outside the traditional area of the international sale of goods. They have been used to insure construction loans, as quasi-performance bonds, to support the issuance of commercial paper and to secure the performance of purely monetary obligations such as those involved in this case." *First Empire Bank-New York v. Federal Deposit Insurance Corp.*, 572 F.2d 1361, 1366–7 (9th Cir.1978).

Accepting the Trustee's and Bank's argument would mean that the beneficiary of a letter of credit could never rely on a letter of credit as an absolute guaranty of repayment. In every case, a beneficiary would have to investigate the source of funds used by a bank to pay it in order to assure it was insulated from any later claims by a trustee in bankruptcy of the non-bank debtor. To hold as the Trustee contends would inject an element of uncertainty in a long-standing commercial practice designed to eliminate uncertainty.

As support for the position that the payment to Alpha Beta was made with the Debtor's funds, it is contended that the payment was not made *under* the Letter of Credit since the Letter of Credit was not due. Alpha Beta could not have demanded payment of the obligation until May 1, 1981, the due date of its note from the Debtor. However, it is clear from the above-quoted language of the April 15 let-

ter of the Bank to Alpha Beta that the payment was made to reduce the *Bank's* obligation to Alpha Beta, not just the Debtor's. It is irrelevant whether the Letter of Credit was due; the Bank chose to volunteer payment.

Assuming, *arguendo*, that the Bank had not made the $78,000 payment on April 15, but rather, on May 1 (when Alpha Beta was entitled to call upon the Letter of Credit), there would have been no preference to Alpha Beta.

█ It is well-established law that there is no preference when a holder of a guaranty is paid by the guarantor notwithstanding the bankruptcy of the party whose performance is guaranteed. *See*, generally, *First National Bank v. Phalen*, 62 F.2d 21 (7th Cir.1972); *In re Zaferis Bros. & Co.*, 67 F.2d 140 (9th Cir.1933); *Newport Bank v. Herkimer Bank*, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912); *In re Page*, 18 B.R. 713 (D.C.1982). As stated by the court *In re M.J. Sales & Distributing Co., Inc.*, 25 B.R. 608 (Bkrtcy.S.D.N.Y.1982),

"A bank honors a letter of credit and pays the beneficiary with its own funds, and not with the assets belonging to the debtor who caused the letter of credit to be issued." (at p. 614)

The court went on to observe that the diminution of the debtor's estate which would give rise to a possible preference action occurs when assets are transferred or pledged as collateral to the bank and not when the bank looks to its collateral for reimbursement. However, in the instant case, the issue of whether the Bank received a preference is not before the Court.

The Bank's obligation to Alpha Beta was irrevocable and independent. Payment by the Bank under the terms of the Letter of Credit on May 1 would have depleted the Bank's assets and not those of the Debtor. If there would have been no preference on May 1, there cannot be a preference on April 15.

## II. *Post-Petition Transfer.*

The Trustee has moved to set aside the post-petition sale of the AT & T stock by

the Bank. Contending that the stock was the property of the estate, he has asked for summary judgment against the Bank for turnover of the proceeds under Section 542 and/or recovery of the proceeds paid to Alpha Beta and Jacobs as a post-petition transfer under Section 549.

■ Pivotal to the Trustee's ability to recover from any of the above defendants is the determination of whether AT & T stock was property of the estate. The Court finds that it was not and accordingly denies the Trustee's motions for summary judgment and grants the cross-motions of Alpha Beta and the Bank.

Section 541(a)(1) defines property of the estate as "... all legal or equitable interests of [the] debtor in property as of the commencement of the case." The Trustee contends that the Debtor had a legal interest in the stock by virtue of the Lent Collateral Agreement. Further, he contends that the Debtor had an equitable interest in the stock because the Lent Collateral Agreement and the "Collateral Receipt: Non-Negotiable" documents (both bank forms) required the Bank to deliver the stock to Price Chopper upon payment of the debt.

The Bank argues that the stock did not become property of the estate because it was lent to the Debtor and "earmarked" for use in satisfaction of the obligation of a specific creditor of the Debtor. The Bank cites 4 *Collier on Bankruptcy* (15th ed.), Para. 547.25, pp. 547–94 which states:

"In cases when a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly 'earmarked'."

The Trustee takes great pains to distinguish the "earmarking" cases claiming that the cited cases involved preferences and not post-petition transfers. However, the Trustee's argument misses the point that in both preference cases (where the issue is depletion of the Debtor's estate by a preferential payment) and in post-petition transfer cases (where the issue is removal of an asset from the Debtor's estate) the critical question is whether there was a transfer of property which could have been a part of the estate available for distribution to all creditors. Although there are no post-petition transfer cases addressing this issue, we find the rationale of the *Grubb v. General Contract Purchase Corp.*, 18 F.Supp. 680 (S.D.N.Y.1937) and *Sun Railings, Inc.*, 5 B.R. 538 (Bkrtcy.S.D.Fla.1980) cases equally applicable to post-petition transfer cases.

Finally, the Trustee argues that even if the earmarking cases are applicable to post-petition transfers, the stock was not earmarked because the Debtor could have used the collateral to pay or secure other debts. It does not appear from the facts before this Court that the Debtor had that choice.

The AT & T stock was never transferred to the Debtor; it remained in the name of its true owner until sold. The Lent Collateral Agreement signed by Jacobs, indicates that the property lent to Price Chopper was 1,012 shares of AT & T stock "... registered in the name of Mrs. Marion Jacobs, Cust., Michele Jacobs Unif. Gift Min. Act. N.Y...." Deductions from the Bancontrol/Price Chopper account were discontinued only when Jacobs pledged her shares of AT & T stock to secure the remainder of the obligation to the Bank. The delivery of the stock to the Bank was made contemporaneously with Jacobs' execution of the Lent Collateral Agreement. When the "Offer To Sell Securities" (another bank form) dated August 7, 1981, was signed by Jacobs shortly before the shares were sold to satisfy the Letter of Credit, she signed in her capacity as custodian for the minors.

The uncontroverted fact that the stock remained registered in Jacobs' name at all times prevented the Debtor from doing anything with the stock other than what Jacobs directed. It remained her property. Accordingly, the stock never entered the Debtor's estate and the post-petition sale of the stock is not in violation of the Section 362 stay, giving rise to a Section 542 recovery, nor a Section 549 post-petition transfer.

This Opinion shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. The attorney for Alpha Beta shall submit an appropriate order within ten (10) days of the filing of this Opinion.