In re **WESTCHESTER TANK FABRICATORS, LTD.,**
Debtor.

Robert J. **MUSSO**, as Trustee for Westchester Tank Fabricators, Ltd., Plaintiff,

v.

**BROOKLYN NAVY YARD DEVELOPMENT CORP.,**
Defendant.

Bankruptcy No. 194–17877–353.
Adv. No. 195–1445–353.

United States Bankruptcy Court,
E.D. New York.

April 18, 1997.

Rosenberg, Musso & Weiner, L.L.P., Brooklyn, New York, for Trustee, by Robert J. Musso, Bruce Weiner.

Windel, Marx, Davies & Ives, New York, New York by Charles E. Simpson, John P. McNicholas, for Brooklyn Navy Yard Development Corp.

## DECISION AFTER TRIAL ON TRUSTEE'S COMPLAINT SEEKING AVOIDANCE AND RECOVERY OF POST–PETITION TRANSFERS

JEROME FELLER, Bankruptcy Judge.

### INTRODUCTION

This adversary proceeding was commenced by Robert J. Musso, Chapter 7 Trustee of Westchester Tank Fabricators, Ltd. (the "Trustee" or "Plaintiff"), with the filing of a complaint dated September 7, 1995, against the Brooklyn Navy Yard Development Corp. (the "Defendant"). The Trustee seeks to recover $152,333.36 transferred to Defendant during the superseded Chapter 11 phase of this bankruptcy case.

The transfers that are the subject of this adversary proceeding are purported to be unauthorized transfers of property of the

estate that are avoidable pursuant to 11 U.S.C. § 549(a), and recoverable pursuant to 11 U.S.C. § 550(a). These transfers were effectuated by way of five (5) checks (collectively, the "Postpetition Transfers"). The checks were all paid to the Defendant pursuant to an agreement entered into between the Defendant and Westchester Tank Fabricators, Ltd. (the "Debtor" or "Westchester Tank") prior to conversion of the Debtor's Chapter 11 case to Chapter 7. The Defendant, who was the Debtor's landlord, was granted relief from the automatic stay early in the Chapter 11 to proceed with the Debtor's eviction. To avoid eviction and the consequent termination of its operations, the Debtor agreed, among other things, to cure its prepetition rent arrears by paying the Defendant $100,000.00 immediately, and thereafter making twenty-four (24) monthly payments of $13,083.34.

It was pursuant to this arrangement that the Defendant received the first of the Postpetition Transfers, a check for $100,000.00 drawn on the account of Queens Plaza North Equities, Ltd. ("Queens Plaza"). The Trustee contends that the Debtor's principal, Louis Evangelista, Jr. ("Evangelista"), owed the Debtor substantial sums of money on account of shareholder loans, that these loans are reflected on the Debtor's books and records, and that Evangelista offset against this debt the $100,000.00 paid to the Defendant by Queens Plaza. (Compl. ¶¶ 10, 11). It is this right to collect monies from Evangelista, purportedly diminished by $100,000.00, that the Trustee seeks to recover from the Defendant. (Compl. ¶ 11). In its answer, dated October 11, 1995, the Defendant admits receipt of this check, but contends this transfer is not subject to avoidance as the $100,000.00 was not property of the Debtor's estate. (Answer ¶ 8). In support of this contention, Defendant relies on the "earmarking doctrine." *See* Def's Proposed Conclusions of Law ¶¶ 5–16.

The four (4) checks constituting the remaining Postpetition Transfers were drawn on Westchester Tank's Chapter 11 debtor in possession account, each in the amount of $13,083.34. (Compl. ¶¶ 12–15). The Defendant also acknowledges postpetition receipt

of these transfers (Answer ¶ 15), and does not dispute that these sums constituted property of the estate. However, the Defendant contends the transfers were authorized by the court and/or by title 11.

Finally, the Defendant asserts various overarching counterclaims arising from the Debtor's substantial postpetition and prepetition rent arrears, for which it seeks payment as an administrative expense or otherwise. The Defendant states it has filed proofs of claims for said sums.

The matter was tried on November 6, 1996. After consideration of the pleadings, joint pretrial memorandum, trial testimony, documentary evidence, credibility of witnesses and both parties' post-trial submissions, including proposed findings of fact and conclusions of law and respective responses thereto, we find that the $100,000.00 transferred to Defendant by Queens Plaza was not property of the estate and therefore not subject to avoidance and recovery pursuant to 11 U.S.C. §§ 549(a) and 550(a), respectively. However, the remaining four (4) Postpetition Transfers, totaling $52,333.36, may be avoided as unauthorized post-petition transfers of property of the Debtor's estate, and the sums recovered by the Trustee. Further, we dismiss the Defendant's counterclaims. Defendant has filed proofs of claim for unpaid rent and any objections thereto or controversies arising thereunder will be adjudicated in that context. *See* Fed.R.Bankr.P. 3007.

This decision constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

### FACTS

A Chapter 11 filing was incepted by Westchester Tank in order to stave off imminent eviction from its place of business—a predicament resulting from the Debtor's abject failure to pay the Defendant any rent. The Debtor's place of business was at the Brooklyn Navy Yard, specifically, buildings 296B, 296C and approximately one (1) acre of open land (the "Premises"), which it leased from the Defendant. *Joint Memorandum* ("*Joint Mem.*"), Uncontested Facts ¶ 1. The lease for the Premises was entered into by and between the Defendant, the Debtor and a

third party, Velis Elevator Corp. ("Velis"), on or about February 1, 1992 (the "Lease"). *Id.*

The Lease is a lengthy and complex document and we will describe only those provisions which might be relevant to this lawsuit. The term was to be at least five (5) years, beginning in 1992 and ending May 31, 1997. Pl's Ex. A at 2. The rent to be paid to the Defendant by the Debtor and Velis was set forth in Article 2. *Id.* at 7–10. Separate rent schedules were established for the two buildings as well as the open land portions of the Premises and provided that the rent for each portion would escalate yearly. *Id.* at 7–8. Due to the dilapidated condition of the buildings, the Lease also provided for certain rent credits should the Debtor improve the property. *Id.* at 9–10. The total combined annual rent before any credits was $202,-500.00 for the first year of the Lease, with yearly increases of approximately $10,000.00 to $11,000.00, to rent of $246,180.00 for the last year of the Lease. *Id.* Taking into account the maximum allowed rent credits, the total combined annual rent for the Premises was $85,920.00 for the first year of the Lease, with yearly increases of approximately $21,000.00 to $24,000.00, to rent of $176,-232.00 for the last year of the Lease. *Id.*

The Debtor and Velis occupied the Premises from in or about July of 1992, but never made any payments under the Lease. Pl's Ex. F. In or about August of 1993, the Defendant commenced in the Civil Court of the City of New York, County of Kings ("Civil Court"), a summary proceeding for non-payment of rent (the "Summary Proceeding"). *Id.* On September 29, 1993, a default judgement in the amount of $202,-436.00 was granted in favor of the Defendant and against the Debtor and Velis. *Joint Mem.,* Uncontested Facts ¶ 2. On August 4, 1994, a warrant of eviction was issued to the City Marshal. *Id.* at ¶ 3. On September 23, 1994, a notice of eviction was served on the Debtor, and the Debtor's eviction was scheduled for September 28, 1994 at 1:00 p.m. *Id.* at ¶¶ 4–5.

On September 28, 1994, in the morning, the Debtor filed a petition for reorganization under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). *Id.* at

¶ 6. At the time of the filing, the Debtor had occupied the Premises, rent free, for over two (2) years and owed the Defendant over $370,000.00 in prepetition rent. Def's Ex. 1. Velis did not file a bankruptcy case and peaceably vacated the Premises. *Id.* at ¶ 7.

Unfortunately for the Debtor, its Chapter 11 filing only served to forestall the inevitable. On October 5, 1994, approximately one (1) week after the case was filed, the Defendant moved for relief from the automatic stay so that it could proceed with the Debtor's eviction ("Relief Stay Motion"). *Joint Mem.* Uncontested Facts ¶ 8; Pl's Ex. F. A hearing on the Relief Stay Motion was held on October 18, 1994. The motion was granted on October 18, 1994, and an order was signed that day lifting the automatic stay so as to permit the Defendant to execute its warrant of eviction ("Lift Stay Order"). *Joint Mem.* Uncontested Facts ¶ 9; Pl's Ex. G. The parties were back quickly to the Civil Court.

The Debtor, seemingly left with little choice, then entered into negotiations with the Defendant regarding the payment of rent. On October 31, 1994, an agreement was reached and an oral stipulation was entered into between the parties on the record before the judge presiding over the Summary Proceeding ("Oral Civil Court Agreement" or "Oral Agreement"). *Id.* ¶ 10. The Oral Agreement fixed prepetition rent arrears at $414,000.00. Pl's Ex. B at 3. It provided, among other things, that the Debtor would pay to the Defendant $100,000.00 on account of prepetition arrears by November 1, 1994, and the balance through twenty-four (24) monthly payments to the Defendant of $13,083.34 starting December 1, 1994. *Joint Mem.,* Uncontested Facts ¶ 11. The Debtor was also required to vacate the open land portion of the Premises and pay the Defendant for postpetition use and occupancy of the remainder. Pl's Ex. B at 9–13. The exact amount to be paid for postpetition use and occupancy is unclear.

Westchester Tank was unable to make the initial $100,000.00 payment. As a result, Evangelista went to family members for the money. Trial Tr. at 26–27. On November 1, 1994, the Defendant received a check for $100,000.00 drawn on the account of Queens

Plaza ("Queens Plaza Check"). *Joint Mem.,* Uncontested Facts ¶ 12; Trial Tr. at 27. Queens Plaza is an entity owned by members of Evangelista's family, but it has no formal legal relationship with the Debtor. Trial Tr. at 25–29. The Queens Plaza Check was payable directly to the Defendant, see Def's Ex. 3, and was hand delivered to the Defendant by Evangelista. Trial Tr. at 27. Defendant thereafter received directly from the Debtor monthly debtor in possession checks of $13,083.34 for December 1994 through March of 1995 (collectively, the "DIP Checks"). *Joint Mem.,* Uncontested Facts ¶ 15. The source of the funds transferred by the DIP Checks was the Debtor's operations. Pl's Ex. J; Trial Tr. at 22.

The Debtor also made five (5) monthly payments of $10,834.00 for postpetition use and occupancy. Def's Ex. 1. It is unclear whether this amount was in complete satisfaction of the Debtor's postpetition obligations to the Defendant for those months. Although several drafts were circulated (Pl's Ex. C, D), the Oral Civil Court Agreement was never memorialized with finality (*Joint Mem.,* Uncontested Facts ¶ 14), or presented to the Bankruptcy Court for approval. Such approval was required under the terms of the Oral Agreement. Pl's Ex. B at 13–14. No payments whatsoever were made after March, 1995 and on June 8, 1995, the case was converted to Chapter 7. Robert J. Musso was thereafter appointed Chapter 7 Trustee and commenced this lawsuit.

## DISCUSSION

■ 11 U.S.C. § 549(a), in pertinent part, vests in a trustee the power to "avoid a transfer of property of the estate—(1) that occurs after the commencement of the case; and ... (2)(B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a). *See Sapir v. C.P.Q. Colorchrome Corp. (In re Photo Promotion Assocs., Inc.),* 881 F.2d 6, 8 (2d Cir.1989); 4 *Collier on Bankruptcy* ¶ 549.02 at 549–6 (L. King ed., 15th ed. 1995). As the party seeking to set aside the Postpetition Transfers, the Trustee bears the burden of proof. *See Moratzka v. Visa U.S.A. (In re Calstar, Inc.),* 159 B.R. 247, 252 (Bankr.D.Minn.1993); *see generally* *Consolidated Partners Inv. Co. v. Lake,* 152 B.R. 485, 488 (Bankr.N.D.Ohio 1993); 9A Am.Jur.2d *Bankruptcy* § 1670 (1991) ("[T]he trustee has the burden of proof in an action or proceeding under the trustee's avoiding powers.").

Here, the Defendant has acknowledged receipt of the Postpetition Transfers. Further, there can be no dispute that the DIP Checks constituted property of the estate. Thus, to prevail on its lawsuit under § 549(a), the Trustee must first prove that the Queens Plaza Check constituted property of the estate. The Trustee must then demonstrate that the Postpetition Transfers were not authorized by title 11 or the court.

### A. The Queens Plaza Check

■ We begin this portion of our discussion by recognizing that although Queens Plaza is owned by members of Evangelista's family, there is no proof of any formal legal relationship between it and the Debtor. Likewise, there is no evidence showing that the funds transferred by the Queens Plaza Check came from the Debtor or its postpetition operations. Indeed, the Defendant contends the Queens Plaza Check was not property of the estate at all, but was funds of a third party paid to it for the specific purpose of reducing the Debtor's debt for prepetition rent arrears. In support of this contention, the Defendant relies on the so called "earmarking doctrine", a judicially created concept usually employed in the context of defending allegedly preferential prepetition transfers under 11 U.S.C. § 547(b).

A central policy of the Bankruptcy Code is equality of distribution among creditors of equal rank. *Begier v. Internal Revenue Serv.,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990). In furtherance of this policy, § 547(b) empowers a trustee to avoid certain preferential prepetition transfers—transfers which redound to the benefit of one creditor at the expense of similarly situated creditors. *Id.* at 60. To be avoidable, however, there is a threshold requirement that the challenged transfer must be a transfer of "an interest of the debtor in property." 11 U.S.C. § 547(b); *see id.* This threshold requirement is satisfied where the

property transferred is property that would have been part of the bankruptcy estate and, therefore, available for distribution to all creditors had it not been transferred before the commencement of the bankruptcy case for the benefit of a singular creditor. *Begier,* 496 U.S. at 60, 110 S.Ct. at 2263–64. The earmarking doctrine developed out of this prerequisite for avoidance of a preferential transfer under § 547(b).

It is well established that payment to a creditor of the debtor, by a third party who is otherwise secondarily liable for the debt paid, such as a surety or guarantor, is not avoidable provided there is no resulting reduction in the funds available for the general creditor body. *See McCuskey v. National Bank of Waterloo (In re Bohlen Enters., Ltd.),* 859 F.2d 561, 565 (8th Cir.1988) (citing *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912)); *Smyth v. Kaufman (In re J.B. Koplik & Co.),* 114 F.2d 40, 42 (2d Cir.1940) (same); *Grubb v. General Contract Purchase Corp.,* 94 F.2d 70, 72 (2d Cir.1938) (same). Under such scenario, a "new" creditor and obligation is simply substituted for an old creditor and obligation, with the transfer having no preferential effect. *See In re Bohlen Enters., Ltd.,* 859 F.2d at 565.

The earmarking doctrine is an extension of this principle. It provides that the transfer of funds by a third party for the specific purpose of paying the debtor's obligation to an existing creditor is likewise not preferential where the third party is merely substituted as creditor, and the debtor's assets and net obligations otherwise remain the same. *See Glinka v. Bank of Vt. (In re Kelton Motors, Inc.),* 97 F.3d 22, 25 (2d Cir.1996); *Grubb,* 94 F.2d at 72. *Accord In re Smith,* 966 F.2d 1527, 1533 (7th Cir.1992), *cert. dismissed, Baker & Schultz, Inc. v. Boyer,* 506 U.S. 1030, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992); *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356, *rehearing denied,* 801 F.2d 398 (5th Cir.1986); *see also United States Lines, Inc. v. United States (In re McLean Indus., Inc.),* 162 B.R. 410, 420 (S.D.N.Y.1993), *reversed on other grounds, In re McLean Industries, Inc.,* 30

F.3d 385 (2d Cir.1994), *cert. denied United States Lines Reorganization Trust, Inc. v. United States,* —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). Funds transferred under these circumstances are deemed to be "earmarked", and not a component of the debtor's overall assets, as their transfer did not diminish the amount available for distribution to creditors. *See In re Bohlen Enters., Ltd.,* 859 F.2d at 565; *In re Smith,* 966 F.2d at 1533; *Coral Petroleum, Inc.,* 797 F.2d at 1356; *In re J.B. Koplik & Co.,* 114 F.2d at 42–43.

■ Defendant contends that the earmarking doctrine similarly applies in the context of defending alleged unauthorized postpetition transfers pursuant to § 549(a). We agree. Like the preference provision, the avoidance power of a trustee under § 549(a) is "exclusively geared toward protecting the rights of creditors via protection of the bankruptcy estate." *Palmer & Palmer, P.C. v. United States Trustee (In re Hargis),* 887 F.2d 77, 79 (5th Cir.1989); *see also Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.),* 930 F.2d 458, 465 (6th Cir.1991). Further, like the preference provision, "the critical question [in actions under § 549(a) ] is whether there was a transfer of property which could have been a part of the estate available for distribution to all creditors." *Boldt v. Alpha Beta Co. (In re Price Chopper Supermarkets, Inc.),* 40 B.R. 816, 820 (Bankr.S.D.Ca.1984). Accordingly, like the preference provision, there is a threshold requirement for avoidance under § 549(a), one with the same parameters.

■ For a transfer to be avoided under § 549(a), it must be a transfer of "property of the estate." 11 U.S.C. § 549(a). *See Martin Machinery Co. v. Williams (In re Newman),* 875 F.2d 668, 670 (8th Cir.1989); *In re Hargis,* 887 F.2d at 79 ("[T]ransfers made to pre-petition creditors out of non-estate assets may not be avoided."). "Property of the estate" is defined by the Bankruptcy Code as "all legal or equitable *interests of the debtor in property* as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added). This definition is virtually identical to the threshold requirement for avoidance under § 547(b),

which is that such a transfer be of an "interest of the debtor in property." The Supreme Court has determined, given the symmetry of language and common policy underlying sections 549(a) and 547(b), that the two concepts, "property of the estate" under § 549(a) and "interests of the debtor in property" under § 547(b), are "coextensive." *Begier*, 496 U.S. at 59 n. 3, 110 S.Ct. at 2263 n. 3. Accordingly, and the few courts which have addressed this issue agree, the rationale of the earmarking doctrine is equally applicable to actions under both § 547(b) and § 549(a). *See, e.g., Herzog v. Sunarhauserman (In re Network 90°, Inc.)*, 98 B.R. 821, 837 (Bankr.N.D.Ill.1989) (holding the earmarking doctrine "logically applies" to postpetition as well as prepetition transfers), *aff'd*, 126 B.R. 990 (N.D.Ill. 1991); *In re Price Chopper Supermarkets, Inc.*, 40 B.R. at 820.

A determination that the $100,-000.00 transferred by the Queens Plaza Check was earmarked is contingent upon whether the Debtor had such control over the use of these funds so as to make evident an interest in property and, concomitantly, whether the disbursement diminished the pool of assets which would otherwise be available to creditors. *See In re Smith*, 966 F.2d at 1533; *Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1069 (6th Cir.1987); *Coral Petroleum, Inc.*, 797 F.2d at 1356; *Grubb*, 94 F.2d at 72; *In re McLean Indus., Inc.*, 162 B.R. at 420; *Tolz v. Barnett Bank (In re Safe–T–Brake, Inc.)*, 162 B.R. 359, 365 (Bankr.S.D.Fla.1993). In light of the desperate financial posture of the Debtor and status of the Chapter 11 case, which was on the brink of collapse at the time of this transfer, we find the Debtor had no control over the disbursement of the $100,000.00 and that the funds were unavailable to the overall creditor body.

At the time of the transfer of the Queens Plaza Check, the Debtor was in imminent danger of being ejected from its place of business as a direct result of the Lift Stay Order. Without question, the Debtor's eviction would have resulted in an abrupt termination of its business operations. To stay in business and continue its Chapter 11 rehabilitation effort, the Debtor reached an accommodation with the Defendant embodied in the Oral Civil Court Agreement. Among other things, the Debtor was required to come up with $100,000.00 within 24 hours to be paid Defendant to salvage any chance of continuing its recently filed Chapter 11 case. The Debtor did not have the funds and Evangelista was forced to raise the money. Evangelista went to his family and hence the Queens Plaza Check. The Debtor had no control whatsoever over the disbursement of the $100,000.00 represented by the Queens Plaza Check as payment to any creditor other than the Defendant, or use of the funds for any other purpose would have resulted in immediate termination of the Chapter 11 case. The monies were given by Queens Plaza specifically to avert such occurrence. Thus, the $100,000.00 never became part of the Debtor's assets and its transfer did not diminish the estate.

*In re J.B. Koplik & Co.*, one of the earliest "earmarking cases", is instructive by way of comparison. In that case, Judge Augustus N. Hand, in affirming the lower court determination that the funds at issue were **not** earmarked, stated as follows:

> "The only interest [the landlord] had in lending money to [the debtor] was to keep the latter in business so that its lease would continue and its rent would be paid. There is no evidence that [the landlord] conditioned this loan ... upon the payment of any particular creditor or that he cared who was paid. We believe the arrangement was such that [the debtor] rather than [the landlord] designated the creditor to be paid and controlled the application of the loan which it secured from its landlord. The existence of this control determines whether the payments were preferential transfers by the bankrupt or were payments by a third party who did not make the loans generally but made them only on condition that a particular creditor receive the proceeds. **The transfer here was not of special funds designated as such by the lender which could never have become generally available to all of the creditors.**"

114 F.2d at 42 (emphasis added); *cf. Grubb,* 94 F.2d at 72 (holding funds loaned to debtor by bank *for the specific purpose of paying a particular creditor,* never became part of the debtor's assets). Here, the Debtor had truly no control over the disbursement of the Queens Plaza Check because only one creditor, the Defendant, could have received the proceeds. The funds were "earmarked" for use in satisfaction of the obligation to a specific creditor and never part of the estate available for distribution to all creditors. Accordingly, the transfer was not of property of the estate and not avoidable. We will now address a number of arguments raised by the Trustee in an unsuccessful effort to avoid this conclusion.

First, the Trustee contends that the apparent absence of any formal loan agreement between the Debtor and Queens Plaza negates invocation of the earmarking doctrine. In that connection, the Trustee correctly points out that at least one court seems to require the existence of such an agreement, and that the parties adhere strictly to its terms, before it may conclude that funds are earmarked. *See In re Bohlen Enters., Ltd.,* 859 F.2d at 567 (holding that a transfer to an existing creditor in satisfaction of an antecedent debt, of funds loaned to the debtor by a third party, is avoidable as a preference where the debt actually paid was not the debt contemplated to be paid by an agreement between a new lender and the debtor). In *Bohlen,* the Eighth Circuit observed: "One cannot conceive of greater or more telling 'control' of the new funds by the debtor than to have the debtor use them for its own purposes and in violation of its agreement with the new lender." *Id.* Upon closer analysis, however, the Trustee's argument evaporates.

 We are satisfied that the absence of a formal loan agreement does not necessarily bar invocation of the earmarking doctrine. As the *Bohlen* court itself recognized, "[w]here a guarantor pays the old creditor directly, the requirement of an agreement between the new lender-guarantor and the debtor is inapplicable." *Id.* at 566 n. 11. Thus, a formal loan agreement serves an important evidentiary purpose in that it provides a court with a means for determining whether a debtor ever had control over the funds in question so that they may be considered property of the estate, under circumstances where such an assessment is often difficult. *See In re Safe–T–Brake, Inc.,* 162 B.R. at 366 n. 3 ("It is unnecessary to consider the elements set forth in *Bohlen* if it is shown that the debtor did not have control over the funds and thus never had an interest in the property."). Where, as here, the Debtor's lack of control has been firmly established, additional evidence of absence of control such as a formal loan agreement is unnecessary. Indeed, there is ample authority for the proposition that a transfer which did not diminish the estate is not avoidable, whether or not the funds in question were truly earmarked. *See In re Smith,* 966 F.2d at 1535–38; *In re Hartley,* 825 F.2d at 1070; *In re Safe–T–Brake, Inc.,* 162 B.R. at 366 n. 3; 4 *Collier on Bankruptcy* ¶ 547.03 at 547–[26–27].

 Next, the Trustee contends that by accepting the Queens Plaza Check without questioning the source of the funds, the Defendant should be precluded from arguing now that the funds were not property of the estate. This argument is grounded in the terms of the Oral Civil Court Agreement which, according to the Trustee, provided that the *Debtor* would make the initial $100,000.00 payment required thereunder. In support of this contention the Trustee invokes the doctrines of waiver and judicial estoppel.

Waiver is "an **intentional** relinquishment or abandonment of a **known** right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added); *see Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1009 (2d Cir.1991). It "requires (1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit." *Dooley v. Weil (In re Garfinkle),* 672 F.2d 1340, 1347 (11th Cir.1982). Waiver may be express, or as is argued here, implied from conduct of a party which is "so inconsis-

tent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary." *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank,* 707 F.2d 680, 685 (2d Cir.1983) (quoting *Alsens Am. Portland Cement Works v. Degnon Contracting Co.,* 222 N.Y. 34, 37, 118 N.E. 210 (1917)).

The related doctrine of judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *See Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1037 (2d Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). It's *raison d'etre* is to preserve judicial integrity and to prevent parties from "playing 'fast and loose' with the courts, thereby avoiding unfair results and 'unseemliness.'" *Young v. United States Dep't of Justice,* 882 F.2d 633, 639 (2d Cir.1989) (citation omitted), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990). The elements of judicial estoppel seem to be (1) the party against whom estoppel is asserted must have staked out an inconsistent position in a prior proceeding, and (2) that prior inconsistent position must have must have been adopted by the court in some manner. *See Bates,* 997 F.2d at 1038.

The burden is on the Trustee to prove the facts supporting his assertions of waiver and judicial estoppel, and this burden is a difficult one. A waiver "should not be lightly presumed", *Berger v. Manhattan Life Ins. Co.,* 805 F.Supp. 1097, 1109 (S.D.N.Y.1992) (citation omitted), and the facts alleged in support thereof must be "clear, unmistakable and without ambiguity." *Port Distrib. Corp. v. Pflaumer,* 880 F.Supp. 204, 211 (S.D.N.Y.) (citation omitted), *aff'd,* 70 F.3d 8 (2d Cir. 1995). Judicial estoppel is rarely invoked and requires that the party against whom it is asserted have intended to deceive a court in asserting its prior inconsistent position, which the court then adopted in making a ruling. *See Young,* 882 F.2d at 639–40 (holding that judicial estoppel requires that a party "has obtained favorable relief with an implicit but misleading representation to a court that he would not subsequently switch positions.").

The Trustee did not raise the issues of waiver and judicial estoppel at trial and instead addresses them for the first time in his post trial submissions. Accordingly, unless the facts alleged are undisputed *and* susceptible to no other rational inference, we will not infer a waiver or invoke judicial estoppel against the Defendant.

The prior position supposedly taken by the Defendant is ambiguous. The Trustee contends that the Defendant agreed, under the terms of the Oral Civil Court Agreement, that the initial $100,000.00 payment would be made by the Debtor. The Defendant acknowledges this assertion but counters that "the source from which the Debtor would obtain the funds to make the payments under the [Oral Civil Court Agreement] was never discussed." *Def's Reply to Pl's Proposed Findings of Fact and Conclusions of Law* ¶¶ 36. It is unclear whether the Oral Civil Court Agreement should be interpreted as mandating that the payments be made from property of the estate. Furthermore, it must be remembered that the Oral Civil Court Agreement itself was never finalized or executed, and any interpretation of its terms must be gleaned from an ambiguous civil court transcript and two unexecuted draft agreements. *See* Pl's Ex. C and D. No testimony or other evidence which might assist this Court in the interpretation of the Oral Civil Court Agreement was offered by the Trustee.

Moreover, even if we were to accept the notion that the payments under the Oral Civil Court Agreement were to be from property of the estate, Defendant's inaction upon receipt of the Queens Plaza Check is likewise ambiguous. It may well be, and understandably so, that the Defendant was only interested in getting paid and was not at all concerned with the source of payment. In any event, the facts as presented are not clear and provide insufficient basis for this court to fairly infer a waiver by the Defendant. *See, e.g., Berger,* 805 F.Supp. at 1109 ("Plaintiff has presented no facts which suggest that it was ever [Defendant's] intent to waive any of its rights or defenses...."). Further, even if the Defendant's prior position or inaction were not ambiguous, the Oral

Agreement was never adopted by any court. It merely embodied a proposed settlement of litigation pending in the civil court which was never presented to any court for approval and may not serve as basis for judicial estoppel. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Georgiadis,* 903 F.2d 109, 114 (2d Cir.1990); *Konstantinidis v. Chen,* 626 F.2d 933, 939 (D.C.Cir.1980) ("A settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel."). Accordingly, the Trustee has failed to sustain his burden regarding his assertions of waiver and judicial estoppel.

Finally, we are not troubled by the Trustee's assertions that Evangelista may have owed the Debtor over $100,000.00 on account of shareholder loans and that he may have entered the Queens Plaza Check as partial repayment of those loans on the Debtor's books and records. This unilateral and probably wrongful action by Evangelista, to the extent it did occur, does not magically transform funds of an unrelated entity over whose disbursement the Debtor had no control, into property of the estate.

### B. *The DIP Checks*

■ Unlike the Queens Plaza check, the Defendant does not dispute that the DIP Checks constituted property of the estate. The evidence and trial testimony are clear that these checks were drawn on the Debtor's DIP account and that the $52,333.36 so transferred was generated from the Debtor's postpetition operations. *See* 11 U.S.C. § 541(a)(6) and (7). Attempting to insulate these transfers from avoidance under 11 U.S.C. § 549(a), the Defendant argues that, for various reasons, these transfers were somehow authorized by this court and/or the Bankruptcy Code. Initially, Defendant contended in its answer that such authorization was implicit in this court's Lift Stay Order. Apparently recognizing the baselessness of this argument, the Defendant did not address this contention in its post-trial submissions and we consider it abandoned. The Defendant also argues, somewhat cryptically, that it is entitled under the Bankruptcy Code to retain the proceeds of the DIP Checks as payment for unpaid postpetition rent and service charges.

The DIP Checks were paid to the Defendant in accordance with the terms of the Oral Agreement *specifically on account of prepetition rent arrears.* The prepetition rent arrears is unsecured debt, *see, e.g., In re JAS Enters., Inc.,* 180 B.R. 210, 215 (Bankr. D.Neb.1995); *In re Kong,* 162 B.R. 86, 97 (Bankr.E.D.N.Y.1993), the payment of which required prior court approval. None was sought or received. Nonetheless, Defendant contends that it may retain the DIP Checks, arguing that the Debtor underpaid certain postpetition obligations payment of which required no prior court authorization. This argument assumes the applicability of 11 U.S.C. § 365(d)(3) and certain consequences which flow from the Debtor's alleged failure to comply with this provision.

■ Section 365(d)(3) provides that "[t]he trustee shall timely perform all the obligations . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." Accordingly, until a trustee (here, the Debtor) assumes or rejects a commercial lease that was in existence at the inception of the bankruptcy case, postpetition obligations arising under such a lease constitute a Chapter 11 administrative expense to be paid by the Debtor as they come due. *See In re Coastal Dry Dock & Repair Corp.,* 62 B.R. 879, 882–83 (Bankr.E.D.N.Y. 1986). Defendant asserts that the Debtor underpaid these postpetition Lease obligations and therefore may retain the DIP Checks in satisfaction of such claimed deficiency. We disagree.

The Second Circuit case of *In re Photo Promotion Assocs., Inc.,* mandates rejection of the Defendant's contentions. In that case, the Court of Appeals was confronted with the analogous dilemma of a creditor who received payments from a Chapter 11 debtor pursuant to an unauthorized postpetition financing agreement. 881 F.2d at 7–8. The case was converted to Chapter 7 and the trustee sought to avoid these payments pursuant to 11 U.S.C. § 549(a). *Id.* The creditor ar-

gued, much as the Defendant does here, that it should be permitted to retain the unauthorized payments as they were obtained in exchange for postpetition financing that conferred a benefit on the estate and for which it was validly entitled to § 503(b) administrative creditor status. *Id.* The Second Circuit rejected this argument and ruled that the bankruptcy court appropriately required the creditor to return the payments, notwithstanding that creditor's entitlement to Chapter 11 administrative expense priority under § 503(b). *Id.* at 10. Recognizing the general principle that all Chapter 11 administrative creditors must be treated equally, and that other Chapter 11 administrative creditors might not receive full payment of their claims, the Court of Appeals stated:

> "if [the Defendant] were allowed to retain the [postpetition transfers], it would be receiving full payment, or more than its likely pro rata share. In addition, it would have had the use of the present value of this money while other equally deserving creditors would have been forced to wait."

*Id.* Thus, the creditor was required to return the funds obtained without authorization and "then wait in line with the other § 503(b) creditors...." *Id.*

The underlying rationale of the Second Circuit in requiring turnover of the funds by the creditor in *In re Photo Promotion Assocs, Inc.,* but at the same time vindicating the administrative priority of the claim, is applicable to the DIP Checks. The record is devoid as to the size of this estate. No evidence has been offered in respect of the amount of other Chapter 11 administrative claims. Nor has any proof been offered as to the amount of Chapter 7 administrative claims, which claims are vested with statutory priority over Chapter 11 administrative claims in this converted case. *See* 11 U.S.C. § 726(b). In addition, the Trustee disputes the very amount of the Defendant's Chapter 11 administrative claim. Thus, if the Defendant was permitted to retain the DIP Checks, other administrative creditors of equal priority or even higher priority might receive less on their claims than the Defendant. This is plainly impermissible.

Defendant retorts that *In re Photo Promotion Assocs., Inc.* is inapplicable because its Chapter 11 administrative claim is predicated on 11 U.S.C. § 365(d)(3), and as such warrants priority over other administrative claims. However, the majority of courts that have tackled the issue of ranking the order of distribution to be accorded unpaid § 365(d)(3) claims have rejected this notion, holding that a landlord is not entitled to immediate payment of its unpaid § 365(d)(3) claims, as a superpriority expense, without regard to whether there were sufficient funds in the bankruptcy estate to satisfy all administrative claims. *See Great Western Sav. Bank v. Orvco, Inc. (In re Orvco, Inc.),* 95 B.R. 724 (Bankr. 9th Cir.1989); *In re MS Freight Distribution, Inc.,* 172 B.R. 976 (Bankr.W.D.Wash.1994); *In re Joseph C. Spiess Co.,* 145 B.R. 597 (Bankr.N.D.Ill. 1992); *Maroon v. Four Star Pizza, Inc. (In re Four Star Pizza, Inc.),* 135 B.R. 498 (Bankr.W.D.Pa.1992); *but see In re Telesphere Communications, Inc.,* 148 B.R. 525, 531–32 (Bankr.N.D.Ill.1992) (disagreeing with majority view and holding that § 365(d)(3) creates a super-priority claim in favor of a landlord which is payable irrespective of administrative solvency of the estate). *See generally Krikor Dulgarian Trust v. Unified Management Corp. (In re Peaberry's Ltd.),* 205 B.R. 6, 7 (Bankr. 1st Cir.1997) (recognizing "the sharply divergent lines of authority treating the relative priorities of landlords' claims for postpetition rent and the claims of other administrative creditors under § 365 and § 503.").

■ In any event, whether or not unpaid § 365(d)(3) claims are entitled to superpriority over other administrative claims is not relevant to Defendant's chapter 11 administrative claims. Section 365(d)(3) is applicable only if a lease for nonresidential real property was in existence at the time the bankruptcy case was incepted. *See In re Kong,* 162 B.R. at 91; 2 *Colliers on Bankruptcy* ¶ 365.02 at 365–22. In this case, a warrant of eviction was issued by the Civil Court prior to the Chapter 11 filing. Under New York law, issuance of a warrant of eviction "annuls the relation of landlord and tenant." N.Y.Real Prop.Acts Law § 749(3) (McKinney 1979). Accordingly, there was no operative

lease when the Debtor filed its Chapter 11 case. *See Bucknell Leasing Corp. v. Darwin (In re Darwin),* 22 B.R. 259, 262 (Bankr. E.D.N.Y.1982). In fact, the Defendant argued this very point as support for its motion seeking the Lift Stay Order. *See* Pl's Ex. F. The Lease was never reinstated. Accordingly, with no formal lease, the Defendant's claim against the estate is, in effect, one for post-petition use and occupancy of the Premises. Such a claim, once quantified, is entitled to recognition as a Chapter 11 administrative claim. Meanwhile, the Defendant must return the monies transferred via the DIP checks and await payment until the court could determine the amount of the claim and ability of the Debtor to pay all other administrative claimants.

## CONCLUSION

Based on all of the foregoing, we find the Trustee has failed to establish by a preponderance of the evidence that the $100,000.00 transferred by the Queens Plaza Check was property of the estate, and the transfer may not be avoided as an unauthorized postpetition transfer under 11 U.S.C. § 549(a). The $52,333.36 transferred by the DIP Checks were unauthorized postpetition transfers which are avoidable under 11 U.S.C. § 549(a), and recoverable by the Trustee under 11 U.S.C. § 550(a). Finally, The Defendant's counterclaims are dismissed as those claims will be adjudicated in the context of any objections by the Trustee to Defendant's proofs of claim.

**SETTLE AN ORDER AND JUDGMENT CONSISTENT WITH THIS DECISION.**