### GRUBB v. GENERAL CONTRACT PURCHASE CORPORATION.
### No. 140.

Circuit Court of Appeals, Second Circuit.
Jan. 10, 1938.

Sydney Krause, of New York City, for appellant.

Harold H. Kissam, of New York City (Lloyd F. Thanhouser, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment dismissing a complaint at law brought by the trustee in bankruptcy of Wm. P. Smith Co., Inc. to recover three payments made by that company in violation of section 60b of the Bankruptcy Act, as amended, 11 U.S.C.A. § 96(b). The case was tried to a judge upon stipulation made in open court; he made findings of the facts and conclusions of law and dismissed the complaint. The facts are as follows. The bankrupt was indebted to the defendant under a note for $25,000, which, since the understanding had been that it should be outstanding for only a short time, the defendant was pressing it to take up. To that end Smith, who was in absolute control of the bankrupt, arranged with the Manufacturers Trust Co. to take over the loan upon the understanding that he would discharge it in a few days, which he hoped to do by a renewed loan from the defendant. On the 14th of May, 1935, Smith signed a note for $25,000 in the bankrupt's name, which the trust company discounted, placing the proceeds to the bankrupt's credit. He at once drew a cheque to the trust company's order for the same amount, and was to receive in its place a cashier's cheque to the order of the defendant, which was simultaneously to surrender its own note for cancellation and deliver to the trust company the collateral by which that note was secured. However, as the parties had reached the trust company's office after the vault had been closed for the night, it was

too late to issue a cashier's cheque till the next morning; but at that time Richardson and Quigley for the defendant attended once more at the office, received the cashier's cheque and delivered their collateral to the trust company's officer. Smith took up and cancelled the defendant's note and the transaction was closed. This was the first of the three payments challenged.

The second and third were connected with each other. Smith had passed to the defendant cheques aggregating about $14,-000 drawn on the bankrupt's account in its bank in Amenia, which had either been dishonored, or were known not to be good. He twice assured Richardson that he would have enough money to pay these on the next day, but both times he failed to get it. On the morning of the 18th he once more said that he had made arrangements to secure $12,500, and this time he succeeded in the following way. On that day the Dover Plains National Bank lent him $6,000 upon a note of the bankrupt, endorsed by him and his father, and secured by collateral of both. In order to get this Smith had told Reynolds of the bank that he was "in a jam" with the defendant and that he must pay $12,500 at once, of which one, Cline, of Wassaïc had agreed to lend $6,500. Reynolds called up the Amenia bank to verify what Smith had said, and finding it to be true, agreed to lend the money "to tide him over the emergency." The proceeds of the loan were credited to the bankrupt, and against them Smith at once drew a cheque, payable to the defendant, which the bank certified and Smith took away. He met Richardson, showed him the cheque, and both went to Smith's bank in Amenia to get Cline's $6,500. Smith had told Cline that he would use this money to buy some new trucks in Buffalo, but Hoose, the cashier of the Amenia bank, knowing that it was to go to the defendant, induced Smith to tell the truth, though it appeared to make little difference to Cline. Cline borrowed $6,500 from the bank on his own note, secured by collateral, the proceeds being placed to his credit; he drew his own check against these, payable to the bank, in exchange for which the bank issued a cashier's cheque for $6,500 on a New York bank, payable to the defendant. This cheque, together with the certified cheque on the Dover Plains Bank, were then handed to Richardson who had been standing by.

▉ The court found, and for the purposes of this case we shall assume, that on the 15th and 18th of May the bankrupt was insolvent, and that the defendant was charged with notice that it was. As the bankruptcy was in June, the plaintiff asserts that the case is no more than the usual one of preferences under section 60b. The defendant answers that in none of the three cases was the money ever within the bankrupt's control or a part of its assets, and that the transactions were therefore no more than the substitution of one creditor for another without loss to the estate, as when a surety gives money to his principal to discharge the debt. National Bank of Newport, N. Y. v. National Herkimer County Bank, 225 U. S. 178, 32 S.Ct. 633, 56 L.Ed. 1042; Bielaski v. National City Bank, 2 Cir., 68 F.2d 723. As to the first transaction there can be no doubt that the defendant is right. It is true that the trust company credited the proceeds of the note to bankrupt's account on the evening of the 14th, and that Smith drew a cheque upon it, to the trust company's order; but it was the cashier's cheque that paid the defendant, and that was withheld till the next day. The trust company delivered it directly to Richardson and Quigley in exchange for their collateral, which everybody but Smith, who had forged it, then supposed to be good. It is entirely plain that the trust company did not intend to let Smith have any control over the credit before it got the collateral, and that it knew that Richardson and Quigley would not give that up until they were paid. Even though the judge had not so found, we should therefore have had no doubt that the proceeds of the bankrupt's note was never part of its assets.

▉ The payment by Cline is as plain, though the reasoning is somewhat different. We shall assume that Cline had no interest in what disposition Smith would make of the money which he lent him; and imposed no condition upon it. Even after Hoose compelled Smith to tell him that he was going to use it to pay the defendant, and not to buy new trucks, Cline was apparently not impressed. But the proceeds of Cline's loan was credited to him, not to the bankrupt, and Smith had no control over them and never got any, for Cline ordered the bank to issue the cashier's cheque to the defendant's order and the bank delivered it directly to Richardson, who was waiting. Nor was Cline's promise to lend the money to the bankrupt an asset of the estate, even though it created an obligation; for the loan was to be for only a few days, and the damages recoverable upon the breach of such a prom-

ise would have been scarcely more than nominal. Bradford, Eldred & C. Ry. Co. v. New York, L. E. & W. R. R. Co., 123 N.Y. 316, 25 N.E. 499, 11 L.R.A. 116; Avalon Construction Corp. v. Kirch Holding Co., Inc., 256 N.Y. 137, 175 N.E. 651; Restatement of Contracts, § 343.

The transaction with the Dover Plains bank is more doubtful. When that bank certified the cheque which Smith had drawn against the new credit of $6000 in the bankrupt's favor it remained in Smith's possession. Certification is only acceptance, section 323, Negotiable Instruments Law, Consol.Laws, c. 38, and no cheque is valid before delivery, section 35, Negotiable Instruments Law; a drawer may return a certified cheque to the drawee and procure a reinstatement of the credit. Furthermore, in the case at bar it would be impossible to impose upon the cheque a trust in the defendant's favor. It is true that Smith had repeatedly promised to borrow enough to take up the dishonored cheques of which Richardson was complaining; and it is also true that a declaration of trust may precede acquisition of the res, and attach to it thereafter. Restatement of Trusts, § 26, Comment k. But Smith's promise was not such a declaration, and if the petition in bankruptcy had been filed before he had delivered the cheque to Richardson at the Amenia bank, Richardson would not have had a valid claim to the money. If the defendant is to succeed, it must therefore be because the Dover Plains bank did not mean to give Smith full control over the proceeds of the loan. So far as we can see, that bank had no financial interest in their disposition; it relied upon the indorsements of Smith and his father and upon the collateral which they had given; besides, there was no reason to assume that, if Smith paid the defendant, the bankrupt's financial ability would be better than if he used the money in new ventures. However, when Smith told Reynolds that he was "in a jam" with the defendant, Reynolds understood that Smith would use the money to get out, and his only motive in making the loan was that he should, because he felt it his duty to prevent a local industry from failing. Reynolds testified that "the loan was given * * * for the specific purpose of making his payment;" he had been enough interested in the proposed destination of the money to call up the Amenia bank to find whether Smith was in the predicament which he said, and whether Cline would give him the additional money necessary. It must be conceded that this does not demonstrate that Reynolds had given Smith to understand that the credit must only be used to pay the defendant; he may not have let his purpose appear to Smith, or at least he may not have given him to understand that he meant to impose it as a condition. But we think that there was some evidence to support such a finding. It is very unlikely, considering what Smith told Reynolds and that Reynolds rang up Hoose to verify it, that Smith should have supposed that Reynolds was indifferent to what he did with the money. Obviously, it was not an ordinary loan—the kind of accommodation that a bank of discount expects to give to its depositors; it was "to tide him over an emergency"; especial motives controlled it. Besides, Smith showed that he meant to use the credit to pay the defendant at the very moment he became entitled to it at all. On such a showing we will not reverse the finding. If it stands, it is enough, for it is not necessary to raise a trust upon the credit; it could not be property held by the bankrupt on behalf of the bank; it was an obligation of the bank itself, to which it might attach whatever conditions it chose; if Reynolds once made it clear that Smith could use it only in one way, that was the only way that he could use it, and it never enriched the estate, no matter what Reynolds's motive may have been.

Judgment affirmed.