## KAGAN v. STROYMAN et al.
### Civil Action No. 3613.

District Court, D. Massachusetts.

Nov. 23, 1945.

Henry Friedman and J. Friedberg, both of Boston, Mass., for plaintiff.

Jacob Levy, of Boston, Mass., for defendant Fay C. Stroyman.

FORD, District Judge.

This is a suit at law by the trustee in bankruptcy of National Metallurgical Company, Inc. (hereinafter referred to as "National"), to recover from the defendant a payment of $4607.83 alleged to have been made by the bankrupt in violation of Section 60, subs. a, b, of the Bankruptcy Act, as amended, 11 U.S.C.A. § 96, subs. a, b. The second count is for the recovery of an alleged fraudulent conveyance of the same amount. The answer is a general denial.

### The Facts.

George Gordon owned all of the shares in and controlled the Old Colony Foundry, Inc., hereinafter referred to as "Old Colony." Old Colony was very profitable during the war years and as a result Gordon was looking for some new enterprise in which to invest some of Old Colony's funds.

National was a small corporation manufacturing metal parts by a novel process which was still in the experimental stage. National, with 200 outstanding shares, was owned and controlled by David Stroyman and his wife, Fay Stroyman, in the follow-

---

ing manner: Fay Stroyman owned 96 shares; David Stroyman owned 4 shares; and there were 100 shares in the treasury of the corporation, which had been purchased by the corporation from one Reisner for twenty $500 notes signed by the corporation. David Stroyman was president and treasurer of National and for all intents and purposes had authority from his wife to act in her behalf. In his own words: "I was the corporation; the corporation was me."

Sometime in February of 1944 Gordon, looking around for a business in which to invest some of the Old Colony funds, became interested in National. His first contact with Stroyman was at the National plant, where Gordon and an Old Colony salesman, Rosenthal, had dropped in to look the plant over. Shortly thereafter Gordon invited Stroyman and his wife to his home to meet with him and his wife on a social plane and discuss the possibility of Gordon entering National. At this meeting and at several subsequent meetings, it was pointed out to Gordon that National was insolvent and would need a substantial investment to put it back on its feet. These facts did not seem to deter Gordon from putting some of Old Colony's war profits into National. At all times he seemed willing to take a chance in an enterprise which he thought showed promise.

After several meetings between the Gordon group and Stroyman they began to talk terms. National at that time, according to the books, owed Fay Stroyman the sum of $4607.83 which she testified she advanced to it from her own funds to pay for machinery, wages, electricity, etc. Stroyman stated to Gordon that this debt to his wife represented a great mental burden to him and to relieve his mind he would like to see his wife paid off. He also represented to Gordon that he was of a scientific mind and not capable of administering the business affairs of National successfully. Gordon was of the opinion that if he could get Stroyman to run the scientific end of the business he (Gordon) and his group could put National on its feet and successfully run the business end of it.

On May 10, 1944, the parties had reached an agreement. In substance it was as follows: Gordon (Old Colony) was to come into National; his initial investment was to be in the amount of National's indebtedness to Mrs. Stroyman and this amount Gordon agreed to turn over directly to Mrs. Stroyman to carry out the terms of an agreement between National and Mrs. Stroyman which is set out below. Stroyman was to turn over to Old Colony enough shares to give it control of National. In addition, on or just before the above date, National entered into a written agreement with Mrs. Stroyman in the following terms:

"Fay C. Stroyman
  "Brookline
  "Massachusetts
"Dear Sir:

"The corporation hereby agrees to pay you the sum of Four thousand six hundred and seven ($4,607.83) Dollars upon the following terms and condition:

"1. That you execute and deliver a release of all claims and demands that you have against the National Metallurgical Company and or David V. Stroyman.

"2. That you will resign as Director and Clerk of the corporation.

"3. That you will transfer and assign to David V. Stroyman all your shares that you hold in National Metallurgical Company.
      "Very truly yours,
      "National Metallurgical Co.
      "/s/ D. V. Stroyman, Pres.
"Assented to:
  "/s/ Fay C. Stroyman."

Also, as part of the agreement, Stroyman was to sign a contract to work for National for one year in a scientific capacity. All these terms were not set forth in one written agreement but were arrived at by a series of written and oral agreements.

As most of these agreements were consummated on May 10, or 11, 1944, a step by step explanation of the events on those two days will aid materially in understanding the facts of, to say the least, a messy business deal.

First, on May 10, David Stroyman turned over a controlling interest in National to Old Colony by transferring to it the 4 shares which he held and the 100 shares which were in the treasury. In return, Gordon drew a check on Old Colony payable to Fay C. Stroyman in the amount of $4607.83. This check was handed by Gordon to Rosenthal, an agent of Gordon, who took it to Brookline and presented

it to Mrs. Stroyman. This was late in the afternoon of May 10, 1944. At that time Mrs. Stroyman turned over to Rosenthal, unendorsed, the 96 shares of stock which she held, which, under the terms of her agreement with National, were to go to her husband, her resignation as clerk and director of National, and her release of National of any indebtedness to her.

After Rosenthal returned to Gordon's office with the 96 shares of stock and the papers signed by Mrs. Stroyman, Mr. Leventhal, Gordon's attorney, suggested that a certified check drawn on National payable to Mrs. Stroyman be substituted for the Old Colony check delivered to her that day. When asked his reason for this suggestion Leventhal merely stated: "I have my reasons." He refused to state what they were. In accordance with this suggestion the parties agreed that on the following day such substitution was to be made.

On the evening of May 10 Gordon drew another check on the Old Colony account, payable to National in the amount of $4607.83. This was endorsed by Mr. Stroyman as president of National and also endorsed by Gordon, who at that time thought his signature necessary because he was to be the new treasurer of National. As this took place after banking hours, Mr. Gordon kept the check in his possession overnight.

The following morning, May 11, the parties met in Mr. Leventhal's office to consummate the agreement. A meeting of stockholders was held and new officers were elected—Mr. Stroyman re-elected president, Gordon treasurer, and Rosenthal's father clerk, of National. Then the labor agreement was drawn up between National and Mr. Stroyman and signed by those two parties. By the terms of this agreement Stroyman was to devote his full time to National for one year and was to post 100 shares of stock in escrow with Mr. Bloch, an attorney, in guarantee of faithful performance of his agreement. National, in return, agreed to pay Stroyman a stipulated salary and to allow the 100 shares to be turned over to him at the end of the year if he performed according to the terms of the agreement.

While this meeting was in session Gordon sent Rosenthal out to the Home National Bank, in Brockton, where Old Colony had its account, to cash the check and return with the cash. Also during that May 11 morning session Stroyman telephoned Mrs. Stroyman at her home and asked her if she had cashed the Old Colony check given her on the previous afternoon. Upon receiving a negative answer he instructed her to retain the check and he said that a certified one would be substituted for it. This she agreed to do.

Shortly after noon Rosenthal returned to Leventhal's office with the $4607.83 in cash. The parties then retired to the Pilgrim Trust Company, where National had its account. The cash was deposited in the account of National, which contained only $27 before that deposit, and a check in the amount of $4607.83 was drawn on National, signed by Stroyman as treasurer, payable to Fay C. Stroyman, and certified by the bank. This certified check was taken by Rosenthal to Mrs. Stroyman's home, exchanged for the Old Colony check given her the previous day, and the Old Colony check was destroyed.

This completed the May 10th and 11th transactions and Mrs. Stroyman was out of the picture.

On May 12, 1944, Gordon enclosed the 96 shares (which Mrs. Stroyman had turned over to Rosenthal for her husband at the time she received the first check) in a letter to attorney Bloch, informing him that these were the shares to be held in escrow for Mr. Stroyman in accordance with the labor agreement which Stroyman and National had entered into. Although it is not too clear how these 96 shares got into Gordon's hands, it is fairly inferable they were mistakenly retained by Gordon when Rosenthal returned with them after delivering the first check to Mrs. Stroyman. As was stated above, under the terms of the labor agreement between Stroyman and National, he was to post 100 shares in escrow with attorney Bloch.

On May 12 Old Colony assumed control of National's affairs. For approximately two weeks Gordon and his group continued to operate National, advancing it to some four or five thousand dollars more of Old Colony's funds to satisfy pressing obligations. Gordon discovered that nearly all of the accounts receivable on National's books were uncollectible due to the fact the orders upon which they were based had been returned as defective. He also discovered that in other ways the

National's books did not reflect the true picture.

An attempt was made to settle National's debts by paying creditors a small percentage of their claims. Stroyman was not in accord with this plan of settlement and after a bitter argument with Gordon, Stroyman resigned. He immediately notified the Jefferson Finance Company, the principal creditor, and they moved in and padlocked the National plant.

On June 8, 1944, a petition in bankruptcy was filed against National and later it was duly adjudicated a bankrupt and the plaintiff was appointed trustee.

### Discussion.

The solution of the problems presented here can only be found after a conclusion is reached as respects (1) the party Old Colony contracted with in the purchase of the controlling interest in National and (2) the terms of that contract. When this is done it will not be difficult to determine the relation of the defendant to National. The plaintiff asserts that National sold the controlling interest to Old Colony and the defendant contends Old Colony in effect contracted with Mrs. Fay Stroyman for the release of her 96 shares, her resignation as clerk and director of National. The defendant is plainly wrong, since it is not disputed that Old Colony was purchasing a controlling interest of National in return for its investment, and Mrs. Stroyman was never in any position to give it. Old Colony was not particularly interested in ridding National of Mrs. Stroyman, but Stroyman was, or pretended he was, for the purpose of securing payment to Mrs. Stroyman of National's alleged indebtedness to her.

Old Colony's agreement for control was with Stroyman. Stroyman was National; he controlled it and was the only person who could deliver control to Old Colony. He was president of National and it was he who made the contract with Gordon whereby Old Colony was to get control. He controlled the 100 shares of treasury stock and could do with them as he pleased. It was the treasury stock, National's stock, with the 4 that Stroyman owned that gave control to Old Colony. Thus, Old Colony's contract for control was with National, through Stroyman, and Old Colony paid $4,607.83 for control, but

paid it in accordance with an arrangement whereby Stroyman's wife, to insure Stroyman's peace of mind (according to Stroyman), received that amount direct from National in payment of an alleged antecedent debt National owed her. That arrangement is found incorporated in the agreement National had with Mrs. Stroyman, set out in full above. There is no question that this agreement, made by Stroyman, was between National and Mrs. Stroyman and it provided that National pay the $4607.83 it got in return for giving control to Old Colony to Mrs. Stroyman in release of National's indebtedness to her. When National first received this money, before it paid it out to Mrs. Stroyman, it was in the complete control and at the complete disposal of National. National could have, if it so desired, paid it out for a purpose entirely foreign to a liquidation of Mrs. Stroyman's alleged indebtedness. Her release of 96 shares to her husband and her resignation as clerk and director do not alter in any way the basic fact that National was relinquishing an asset of $4607.83 in return for a discharge of its debt to her. Neither her shares in the bankrupt transferred to her husband (not National) nor her resignation as clerk and director could possibly be regarded as consideration paid to National. The transfer of shares from one stockholder to another does not increase the assets of a corporation.

### Conclusions of Law.

■ There was no dispute that Mrs. Stroyman knew National was insolvent when the transfer of the $4,607.83 to her was made. The transfer from National was on account of an antecedent debt. All the elements of a preference outlined in Section 60, subs. a, b, of the Bankruptcy Act, 11 U.S.C.A. § 96, subs. a, b, are present here and the trustee in bankruptcy should be entitled to retrieve the money paid to Mrs. Stroyman on May 11, 1944. The trustee in bankruptcy has carried his burden by showing plainly a depletion of assets by the transaction outlined above, and the cases cited by the defendant (Bachner v. Robinson, 2 Cir., 107 F.2d 513; Grubb v. General Contract Purchase Corporation, 2 Cir., 94 F.2d 70; and others) are not apposite.

■ With respect to the second count of the plaintiff's complaint, I find the plaintiff has not sustained his burden of

proving an intent on the bankrupt's part, in transferring the $4607.83 to Mrs. Stroyman, to hinder, delay, or defraud creditors within the meaning of Section 67, sub. e of the Bankruptcy Act, 11 U.S.C.A. § 107, sub. e. Count 2 is dismissed.

Judgment will be entered for the plaintiff on the first count in the sum of $4,-607.83 with interest and costs.