**In re Charles Atwood FLANAGAN, Debtor.**

**Bonnie C. Mangan, Trustee, Plaintiff,**

**v.**

**The Cadle Company, Defendant.**

**Bankruptcy No. 99–30565.**
**Adversary No. 99–3053.**

United States Bankruptcy Court,
D. Connecticut.

May 22, 2003.

104

control of the Chapter 7 trustee, Bonnie C. Mangan—seeks to avoid and recover an alleged preferential transfer made by the Debtor to or for the benefit of the Defendant in the approximate amount of $100,000.00. As detailed herein, the bankruptcy estate is entitled to a judgment, but in an amount less than that prayed for in the Complaint.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. § 157(a). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(F).

Douglas S. Skalka, Esq., Neubert, Pepe & Monteith, P.C., New Haven, CT, for Plaintiff.

Edward C. Taiman, Jr., Esq., Sabia & Hartley, LLC, Hartford, CT, for Defendant.

## MEMORANDUM OF DECISION ON COMPLAINT FOR AVOIDANCE OF PREFERENTIAL TRANSFER

ALBERT S. DABROWSKI, Chief Judge.

## I. INTRODUCTION

This adversary proceeding—initially commenced and prosecuted by the Debtor-in-possession during the Chapter 11 phase of this case, and now under the fiduciary

## III. FACTUAL AND PROCEDURAL BACKGROUND

The following factual and procedural background is derived from (i) the evidentiary record at trial of this adversary proceeding, (ii) the files and records of the instant bankruptcy case and adversary proceeding, and (iii) the facts as agreed between the parties in a certain *Stipulation to Facts and the Admissibility of Documents as Full Exhibits* (Doc. I.D. No. 21).[1]

1. On February 17, 1999 (hereafter, the "Petition Date"), the Debtor, Charles Flanagan (hereafter, "Flanagan" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

---

1. These findings of fact are made for the purposes of this adversary proceeding only, on the basis of the unique evidentiary record developed by the parties hereto. This observation is particularly important since there is pending in this Court at least one other adversary proceeding premised upon, *inter alia,* the same alleged conduct. That adversary proceeding—No. 02–3031—is presently ripe for resolution on its own, unique summary judgment record.

2. Flanagan commenced this adversary proceeding as debtor-in-possession. Upon the conversion of the Debtor's case from Chapter 11 to Chapter 7, Bonnie C. Mangan (hereafter, the "Trustee") was appointed as trustee of Flanagan's bankruptcy estate. The Trustee was thereafter substituted as Plaintiff herein as the real party in interest.

3. The Defendant, The Cadle Company (hereafter, "Cadle" or the "Defendant"), is, and was at all times relevant to this adversary proceeding, a creditor of Flanagan by virtue of its holding, at all times relevant hereto, one or more promissory notes executed by Flanagan prior to the Petition Date.

4. On March 20, 1997, in a matter known as *The Cadle Company v. Charles A. Flanagan*, Civil Action No. 3:96–CV–02648, United States District Court, District of Connecticut (hereafter, the "District Court Action"), the Honorable Alfred V. Covello (hereafter, "Judge Covello") entered judgment in favor of Cadle and against Flanagan in the amount of $90,747.87 (hereafter, the "Judgment"). Prior to the Judgment, Cadle held no security interest or other lien in property to secure the debt represented by the Judgment.

5. Among the assets owned by Flanagan at the time of the Judgment were 50% equity interests in Thompson & Peck, Inc. and Flanagan/Prymus Insurance Group, Inc., (hereafter, collectively, "Thompson & Peck"). The value of Flanagan's equity interest in Thompson & Peck is difficult to determine with precision upon the present record, but at all relevant times certainly exceeded $100,000.00.

6. At all relevant times Flanagan's equity interest in Thompson & Peck was evidenced by one or more stock certificates (hereafter, the "Stock").

7. At the time of the Judgment the Stock was physically held by Flanagan.

8. In or about September of 1997, Flanagan transferred possession of the Stock to one Socrates Babacus (hereafter, "Babacus") as security for loans made by Babacus to Flanagan in the aggregate amount of $85,000.00 (hereafter, the "Babacus Obligation").[2]

9. As part of its effort to satisfy the Judgment, Cadle served Flanagan with a subpoena duces tecum (hereafter, the "Subpoena") requiring him to appear on March 9, 1998, at a judgment debtor examination before Judge Covello in Hartford, Connecticut. Pursuant to the terms of the Subpoena, Flanagan was to produce, *inter alia*, "all documents ... relating to or evidencing any interest which [Flanagan] may hold in Thompson & Peck". Flanagan appeared at the March 9, 1998 examination but did not produce the Stock.[3] By motion dated March 12, 1998, Cadle moved the District Court for an order commanding Flanagan to turn over to Cadle "all stock certificates in his ... possession, under his ... control ...." (hereafter, the "Motion for Turnover"). On April 13, 1998, Judge Covello margin endorsed the Motion for Turnover as "GRANTED" (hereafter, the "Turnover Order").

---

**2.** Flanagan testified at trial that he "guess[ed]" the Babacus Obligation was "upwards of $80 to $85,000.00, approximately". Despite the imprecision of this unrebutted testimony, this Court finds the amount of that obligation to be $85,000.00. Such a finding is appropriate given the Court's assignment to the Plaintiff of the burden to demonstrate a lesser sum for reasons made apparent in Section IV.B. of this Memorandum of Decision.

**3.** Also on March 9, 1998, Judge Covello entered an order prohibiting Charles from transferring any assets.

10. By motion dated April 22, 1998, Flanagan requested that the District Court reconsider its Turnover Order. By order dated September 23, 1998, Judge Covello granted Flanagan's motion for reconsideration but denied the substantive relief requested therein.

11. On November 6, 1998, Cadle filed a Judgment Lien Certificate with the Connecticut Secretary of the State with respect to the Judgment.

12. On November 16, 1998, a hearing was held before Judge Covello, at which Flanagan was to show cause why a finding of contempt should not enter for failure to comply with the Turnover Order. After taking testimony and listening to oral argument, Judge Covello ruled, *inter alia,* that "it has been established here that . . . [Flanagan] has wilfully and intentionally not complied with the order as previously entered by the Court, and orders him committed to the Bureau of Prisons until such time as he purges himself of the contempt by complying fully with the order. . . . [I]t's very evident that there hasn't been a full-hearted and whole-hearted attempt to comply with the order that was entered."

13. Motivated by a desire to keep his son out of prison, and not allow the family name to be further tarnished before Judge Covello, Flanagan's father, the Honorable John Flanagan (hereafter, "Judge Flanagan"), a judge of the Connecticut Superior Court, loaned Flanagan the sum of $100,222.87, for the specific purpose of fully satisfying the Judgment (hereafter, the "Family Loan"). Judge Flanagan had never before loaned money to his adult son.

14. To effectuate the Family Loan, Judge Flanagan delivered a personal check to his son on or about November 18, 1998 (hereafter, the "Family Loan Funds"). After receiving this check from his father, Flanagan immediately delivered and endorsed the same to his lawyer, Leonard Fasano, who in turn immediately deposited the same into his clients' funds account. Thereafter, Attorney Fasano tendered the sum of $99,542.87 to Cadle through its attorney. That tender was refused by Cadle, but on November 20, 1998, Attorney Fasano, with leave of Judge Covello, deposited the tendered funds into the Registry of the District Court by check (hereafter, the "Payment"). Cadle eventually received the Payment pursuant to an Order of Judge Covello, dated December 3, 1998, granting Cadle's *Motion for Payment of Monies Deposited into Court.*

15. At the time of the Family Loan, Judge Flanagan required that his son provide collateral to secure its repayment. Flanagan requested that Babacus relinquish possession of the Stock, and deliver the same to Judge Flanagan so that it might serve as collateral for the Family Loan. On or about November 19, 1998, Babacus delivered the Stock to Judge Flanagan by leaving the certificates on a table in Judge Flanagan's home in his absence, but in the presence, and at the direction, of Flanagan.

16. At all times relevant to this adversary proceeding, and specifically on the date of the Payment, Flanagan was "insolvent" as that term is defined in 11 U.S.C. § 101(32) (1999).

## IV. DISCUSSION

The Plaintiff–Trustee seeks to avoid the Payment as "preferential" under the authority of Bankruptcy Code Section 547, which provides in relevant part as follows:

\*     \*     \*     \*     \*     \*

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property–

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; . . . . and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title. . . .

\*        \*        \*        \*        \*        \*

11 U.S.C. § 547 (1999).

■ The Plaintiff bears the ultimate burden of proof by a preponderance of the evidence on all of the elements of a preferential transfer under Section 547(b). 11 U.S.C. § 547(g) (1999). As detailed in the Factual Background Section of this Memorandum of Decision, the Plaintiff has readily established elements (1)—(4) of Section 547(b). Still, the Defendant asserts two lines of defense, to wit: (i) that the Plaintiff has failed to prove that the Payment was a "transfer of an interest of the debtor in property" within the contemplation of Section 547; and (ii) that the Plaintiff has not established element (5) of Section 547(b)—*i.e.* that the Payment enabled Cadle to receive more than it would have received if the Payment were not made and Cadle received distribution pursuant

to its rights under the Bankruptcy Code.[4] These defenses are treated in reverse order below.

## A.   Improvement of Position.

■ In order to be considered "preferential", a transfer must improve the position of the target creditor in the manner described in Section 547(b)(5), *i.e.* the transfer must enhance the creditor's position over that which it would have enjoyed if the subject transfer had not been made and the creditor received distribution on its claim under the provisions of the Bankruptcy Code. Cadle contends that its position did not improve via the Payment because at that time its Judgment was a fully secured obligation—by virtue of a lien[5] on the Stock—and thus even if the Payment had not been made, Cadle's secured position would have "ridden through" the Debtor's bankruptcy filing, eventually resulting in full payment of the Judgment. Cadle is correct as to the effect of bankruptcy upon a fully secured obligation; however, its defense is untenable because as a matter of fact and law the Judgment was never "secured".

Although the lines of Cadle's argument are not entirely clear, it seems to advance two alternative theories as to how the Judgment became "secured" prior to the opening of the 90–day bankruptcy preference window. First, it urges this Court to declare that Cadle was in constructive possession of the Stock as the beneficiary of a trust arising from Flanagan's alleged misconduct in connection with Cadle's post-Judgment discovery. Second, Cadle claims that its filing of a Judgment Lien Certificate with the Connecticut Secretary

---

**4.** The Defendant has not asserted any affirmative defenses under Section 547(c).

**5.** Lien means "charge against or interest in property to secure payment of a debt or performance of an obligation". 11 U.S.C. § 101(37) (1999).

of State imparted a lien on the Stock to fully secure the Judgment.

### 1. Constructive trust theory.

■ Cadle's constructive trust/possession argument proceeds on a faulty premise—that its possession of the Stock would alone have vested its Judgment with a perfected secured status. In making this assumption Cadle references provisions of Connecticut's version of the Uniform Commercial Code (hereafter, the "UCC"), particularly C.G.S. § 42a–9–305 (1998).[6] However, Cadle's reliance on the UCC is misplaced. Since Article Nine of the UCC applies only to consensual security interests, *see, e.g.,* C.G.S. § 42a–9–102(1) (1998), and is inapplicable to liens which may secure judgments, *cf.* C.G.S. § 42a–9–104(h) (1998), it provides no basis for Cadle's putative secured status. Instead, Cadle's property rights in the Stock vis-a-vis its Judgment are properly determined with reference to the judgment execution law of the State of Connecticut[7]—codified in Title 52, Chapter 906 of the Connecticut General Statutes, "Postjudgment Procedures".[8]

With that understanding in mind, Cadle might argue more persuasively that it should be deemed a beneficiary of a constructive trust in the Stock owing to misconduct by Flanagan *which prevented it from executing on the Stock under Connecticut Postjudgment Procedures.* Cadle could argue that if Flanagan had properly complied with the Subpoena, testified fully, and/or followed the dictates of Judge Covello's orders, it would have learned of the Stock's existence and location—with Babacus—at an early enough time to permit it to execute on the Stock in Babacus' hands, *see* C.G.S. §§ 42a–8–112, 52–356a(a)(4)(C) (1998), and receive, prior to the opening of the preference window, either (i) the forced sale proceeds of the Stock, *see* C.G.S. §§ 52–356a(b), (d) (1998), or (ii) payment of the Judgment in full directly from Flanagan, so as to prevent the forced sale.[9] However, it can also be argued persuasively that collection action along the lines just outlined would have prompted an *earlier* bankruptcy filing by Flanagan that arguably would have negated the benefit of Cadle's Judgment execution activity.[10]

■ The imposition of constructive trusts by bankruptcy courts possesses a solid legal basis in this Circuit. *See Sanyo*

---

**6.** Even if the UCC governed Cadle's rights, C.G.S. § 42a–9–115 (1999) (governing perfection of security interests in investment property), not § 42a–9–305 (governing such perfection in goods, instruments, money, negotiable documents or chattel paper), would be the appropriate citation in connection with the certificated securities involved here.

**7.** Fed.R.Civ.P. 69(a), made applicable to this proceeding by Fed. R. Bank. P. 7069, provides, *inter alia,* that "[t]he procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held . . . . "

**8.** The Postjudgment Procedures Chapter is supplemented, in the case of certificated securities, *inter alia,* by C.G.S. § 42a–8–112 (1998).

**9.** The Court has located no authority supporting the proposition that an execution levy imparts a *lien* interest in the levied property in favor of the judgment creditor. Thus, the argument imputed to Cadle here does not technically contend that *secured status* was frustrated through misconduct, but rather that *impoundment for execution sale* was denied through Flanagan's concealment.

**10.** This negation could occur through the avoidance of a preferential transfer, or through compelled turnover of the Stock by a levying officer. *See* 11 U.S.C. §§ 542, 543, 547 (1998).

*Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),* 874 F.2d 88 (2d Cir.1989) (recognizing the existence of a constructive trust under New Jersey law, and applying that trust retroactively to exclude from a bankruptcy estate property in which a creditor's security interest had been undermined by the prepetition misconduct of the debtor). Nonetheless, the question of whether the basis for a constructive trust resulted from Flanagan's specific conduct is a matter of Connecticut state law. *Id.* Although Connecticut case law does not provide direct precedent under the unique facts of this adversary proceeding, the Connecticut Supreme Court has articulated generally the circumstances under which a constructive trust will be recognized:

> ... a constructive trust arises ... against one, who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, *concealment,* or questionable means, or who in any way against equity and good conscience, either has obtained or holds legal title to property which he ought not, in equity and good conscience, hold and enjoy.

*Zack v. Guzauskas,* 171 Conn. 98, 103, 368 A.2d 193 (1976) (emphasis supplied).

Flanagan is certainly guilty of "concealment" of relevant information concerning the Stock.[11] That fact was plainly determined by Judge Covello.[12] Thus, an assessment of conduct alone could lead to the conclusion that Flanagan should be deemed a constructive trustee. Nonetheless, Cadle's constructive trust argument fails because Cadle is not an appropriate *beneficiary* of a constructive trust.

First, it is important to appreciate that Cadle enjoyed no vested property interest in the Stock prior to Flanagan's post-judgment misconduct, only an expectation of the potential fruits of execution thereon. Cadle has not cited, and this Court has not independently located, any judicial authority which has impressed a constructive trust upon property in which the purported beneficiary possessed only an expectation interest. Second, even if Flanagan had fully complied with Cadle's post-Judgment discovery, Cadle would not thereby have obtained title or a lien interest in the Stock. *See* fn. 9, *supra.* Third, it is possible—indeed, probable—that any execution activity by Cadle with respect to the Stock would have been negated in the context of an accelerated bankruptcy filing by Flanagan. While Flanagan's concealment permitted him to preserve his title to the Stock free from Cadle's *potential* execution, it is not certain, or even likely, that if Flanagan *had* been forthcoming with information about the Stock, and Cadle had then executed thereon to satisfy its Judgment, that Cadle would have *retained* the benefit of its collection efforts free from bankruptcy avoidance. It is one thing, as

---

11. It seems clear to this Court, however, that Judge Covello sought to compel Flanagan's production of the Stock for *discovery* purposes, not for the purpose of facilitating its *seizure* by Cadle, or its levying officer, for purposes of judgment execution. Otherwise, such orders would be inconsistent with Connecticut post-judgment procedure—which provides for discovery as preliminary to, not coincident with, actual execution. *See, e.g.,* C.G.S. § 52–351b (1998). For these reasons it also seems apparent that production of a *photocopy* of the Stock, coupled with full disclosure of the Babacus Obligation, would have been sufficient to meet Flanagan's legal duties. It would then have been up to Cadle to attempt execution upon the Stock in Babacus' hands pursuant to, and with the due process safeguards provided by, Connecticut post-judgment procedure.

12. Re-litigation of this fact in this Court is foreclosed on principles of collateral estoppel, *inter alia.*

in *Howard's Appliance,* to impose a trust to protect vested property rights which are impaired through misconduct; it is quite another, as would be required here, to create a trust to protect property rights which may or may not have become vested and indefeasible.

### 2. Judgment lien.

■ Having determined that the Judgment should not be deemed "secured" under a theory of constructive trust, the Court now turns to address Cadle's alternative basis for its alleged pre-Payment "secured" status, namely its possession of a judgment lien. C.G.S. § 52–355a sets out the procedure for obtaining a judgment lien on non-exempt personal property [13]—a procedure that closely tracks the financing statement filing system under the UCC. Section 52–355a(a) provides as follows:

> Except in the case of a consumer judgment, a judgment lien, securing the unpaid amount of any money judgment, including interest and costs, may be placed on *any nonexempt personal property in which, by a filing in the office of the secretary of the state, a security interest could be perfected under title 42a.* The judgment lien shall be created by filing a judgment lien certificate in the office of the secretary of the state.

C.G.S. § 52–355a(a) (1997) (emphasis supplied). "Investment property", such as the Stock,[14] is personal property in which a security interest can be perfected by filing. *See* C.G.S. § 42a–9–115(4)(b) (1997). Thus, assuming that Cadle's Judgment Lien Certificate (hereafter, the "Certificate") met all legal requirements as to form, Cadle would have achieved a lien interest in the Stock as of the filing of that Certificate.

The specific requirements of form for a judgment lien are set out in detail in C.G.S. § 52–355a(b), to wit–

> The judgment lien certificate shall: (1) Be signed by the judgment creditor or his attorney or personal representative; (2) state the names and last-known addresses of the judgment creditor and judgment debtor, the court in which and the date on which the judgment was rendered, and the original amount of the money judgment and the amount due thereon; and (3) *describe the personal property on which the lien is to be placed.*

C.G.S. § 52–355a(b) (1997) (emphasis supplied). Although the Certificate here was in general conformance with the dictates of this Section, its property description vis-a-vis the Stock was defective. Specifically, Cadle did not describe the Stock with due particularity.

Since the apparent intent of the Connecticut legislature was to conform its judgment lien procedure to the UCC Financing Statement scheme, it is appropriate to look to the UCC to inform an analysis of the adequacy of the Certificate's property description vis-a-vis the Stock. Section 42a–9–115(3) provides as follows–

> A description of collateral in a ... financing statement is sufficient to ... perfect a security interest in a certificated security, uncertificated security, security entitlement, securities account, commodity contract or commodity account whether it describes the collateral by those terms, or as investment property, or by description of the underlying security, financial asset or commodity

---

13. *See* fn. 6, *supra.*

14. "Investment property" means, *inter alia,* "[a] security, whether certificated or uncertificated".

contract. A description of investment property collateral in a ... financing statement is sufficient if it identifies the collateral by specific listing, by category, by quantity, by a computational or allocational formula or procedure, or by any other method, if the identity of the collateral is objectively determinable.

C.G.S. § 42a–9–115(3) (1997). In light of the foregoing, the Court concludes that the property description contained in the Certificate would be insufficient to perfect (through filing) a *security interest* in the Stock. That description does not mention any equity security by name, type or class, or even "investment property" generally. And although the Certificate utilized super-generic descriptions of property—*e.g.*, "any and all personal property", "all other tangible or intangible property", etc.— which theoretically include property such as the Stock, such broad terms are plainly insufficient to perfect a security interest in securities and other investment property. *See, e.g., id.* Accordingly, at no time relevant to this adversary proceeding did Cadle hold a judgment lien in the Stock.

**B. Earmarking Defense.**

In addition to alleging no improvement in position, Cadle also asserts that there has been no "transfer of an interest of the debtor in property" within the spirit of Bankruptcy Section 547(b). While conceding that, as a general rule, a debtor's payment of a debt with *borrowed* funds constitutes a transfer of a property interest of the debtor, Cadle points out a fundamental exception to that principle: "where the borrowed funds have been specifically *earmarked* by the lender for payment to a designated creditor, there is ... no transfer of property of the debtor even if the funds pass through the debtor's hands in getting to the selected creditor." *In re Montgomery,* 983 F.2d 1389, 1395 (6th Cir.1993) (emphasis supplied). This is

a fair statement of the so-called "earmarking" doctrine, which has found favor in various Circuits, including the Second Circuit. *See, e.g., Glinka v. Bank of Vermont (In re Kelton Motors, Inc.),* 97 F.3d 22, 28 (2d Cir.1996). According to these authorities, the earmarking doctrine does not frustrate the principles on which preferential transfer avoidance is based since the borrowed funds would never have been available to the debtor unless the subject creditor payment was to be made, *i.e.* there is no true diminution of the prospective bankruptcy estate because all that has really occurred is the substitution of one creditor for another. *See e.g., Coral Petroleum v. Banque Paribas—London,* 797 F.2d 1351, 1356 (5th Cir.1986).

The funds at issue in this proceeding were certainly "earmarked". The record here amply supports the fact that the Family Loan Funds were lent to Flanagan by his father for the specific purpose of paying the Judgment. There is no doubt that Judge Flanagan made such funds available to his son for the sole purpose of purging Flanagan's contempt before Judge Covello through satisfaction of the underlying Judgment. Nonetheless, the Plaintiff argues that despite Judge Flanagan's intent, the fact that Flanagan had actual control over the disposition of the Family Loan Funds between the time of their receipt by him and their eventual payment to Cadle renders the Payment not shielded by the earmarking doctrine. Relying on the District Court opinion in *In re Kelton Motors, Inc.,* 153 B.R. 417 (Bankr.D.Vt. 1993), the Plaintiff argues that the earmarking defense is only available when the debtor "*could not have put the [borrowed] funds to any other use*" besides the payment of the debt of the defendant. *Id.* at 428 (emphasis supplied). This is not an accurate statement of the law applicable to this proceeding.

Quite aside from the fact that the Court of Appeals' opinion in *Kelton* declined to affirm the District Court's limitation of the earmarking doctrine,[15] there exists Second Circuit authority which directly supports Cadle's position. In *Grubb v. General Contract Purchase Corporation*, 94 F.2d 70 (2d Cir.1938), through an opinion authored by Judge Learned Hand, the Court of Appeals affirmed the lower court's dismissal of a trustee's preference claims upon an earmarking defense. The bankruptcy trustee in *Grubb* had sought to avoid three separate transfers to the creditor-defendant. Although all three transfers were deemed non-preferential under the earmarking doctrine, only one of the three has implications for the case at bar. In that transaction the debtor borrowed $6,000.00 from the Dover Plains National Bank (hereafter, the "Bank") for the purpose of making good certain bad checks previously given to the defendant. The debtor told the Bank that he was "in a jam" with the creditor-defendant; and the Bank's officer testified that he made the loan to tide the debtor over an "emergency" out a sense of a duty to prevent a local industry from failing. He further testified that "the loan was given . . . for the specific purpose of making . . . payment" to the defendant. Despite that intention, the Bank took no formal steps to restrict the debtor's use of the borrowed funds; it simply credited the loan proceeds to the debtor's account. And although the debtor technically had the ability to put those proceeds to any use it chose, it honored the Bank's "specific purpose" by immedi-

ately drawing a check made payable to the defendant, which check was then certified by the Bank and delivered to the defendant. Judge Hand's opinion agreed with the lower court that this factual scenario fit within the umbrella of the earmarking defense. Thus the key to the applicability of that defense appears to be *the expressed purpose of the lender*, as Judge Hand stated, "if [the Bank] once made it clear that the debtor could use [the credit] only in one way, that was the only way that [it] could use it, and it never enriched the estate". *Id.* at 73.[16]

The facts in the present case are at least as compelling as those in *Grubb*. The Family Loan was extraordinary; Judge Flanagan had never before loaned money to his son, and he was motivated both by familial ties and a desire to preserve his own reputation in the community. Under those circumstances it was natural for Judge Flanagan to provide funds to his son for the exclusive purpose of satisfying the debt that was at issue in Judge Covello's court. In sum, because the Family Loan Funds were provided on the condition that they be used to make the Payment, and were therefore "earmarked" for that purpose, they did not become part of Flanagan's personal estate for purposes of the instant preference analysis.[17]

Accordingly, because Judge Flanagan provided the Family Loan Funds for the sole and specific purpose of permitting his son to make the Payment to Cadle, the Payment, *standing alone*, is not a preferential transfer since it consisted of "ear-

---

15. *See Kelton Motors*, 97 F.3d at 28 fn. 3.

16. The fact that *Grubb* decided a preference action based on Section 60b of the former Bankruptcy Act does not diminish its authority over preference cases under Section 547 of the Bankruptcy Code. Since the earmarking defense has always animated the *principles* underlying preference avoidance—principles which have not changed since 1938—any technical differences in the operative law are of no consequence.

17. The facts of the instant proceeding also track those in *Grubb* in that the funds loaned to the debtor were *immediately* employed to implement the intention of the lender.

marked" borrowed funds, not the unrestricted personal funds of Flanagan. However, this conclusion does not end the inquiry before the Court since the Payment was part of a larger transaction that undermines, to some degree, the Defendant's earmarking defense.

What is critical in the subject transaction *as a whole* is that Flanagan borrowed from his father on a *secured* basis in order to pay off an *unsecured* obligation to Cadle. So, even though the transaction fits the earmarking defense insofar as it replaced one creditor (Cadle) with another (Judge Flanagan), the substitution of a *secured* for an *unsecured* obligation attenuates that defense because, and to the extent, it caused a diminution to Flanagan's personal estate, *i.e.* a reduction in the amount of property available to unsecured creditors. Accordingly, to the extent that the Family Loan encumbered previously unencumbered property of Flanagan to enable the Payment, there is no earmarking defense available to Cadle, and the Payment is voidable and recoverable from it.

The record in this proceeding establishes that Judge Flanagan loaned his son the sum of $100,222.87, and collateralized that loan via a perfected security interest in the Stock (hereafter, the "Flanagan Lien"). From those secured loan funds Flanagan effected the Payment—in the amount of $99,542.87. The record also establishes that prior to the creation of the Flanagan Lien, the Stock was encumbered by a security interest in favor of Babacus (hereafter, the "Babacus Lien"),[18] to secure the Babacus Obligation. There was no evidence adduced to support a determi-

nation that *after* the Stock Delivery Babacus enjoyed a security interest in the Stock *in addition to* that of Judge Flanagan. Rather, the Court concludes that the Flanagan Lien *supplanted* the Babacus Lien. Therefore, the net diminution of Flanagan's estate attributable to the Payment was $14,542.87—the amount of the Payment ($99,542.87) *minus* the amount of the Babacus Obligation ($85,000.00).

## V.  CONCLUSION

For the foregoing reasons judgment shall enter in favor of the Plaintiff, avoiding the Payment, and authorizing its recovery from the Defendant, to the extent of $14,542.87.

---

18.  Although the Court heard credible testimony regarding a security agreement between Babacus and Flanagan, it did not receive any documentary evidence memorializing such an agreement.  However, given Babacus' possession of the Stock, it was not necessary for the security agreement to be in writing.  An *oral* agreement coupled with possession—or simply "control" in the case of "investment property"—was sufficient to create a security agreement and perfect the resulting security interest.  *See* C.G.S. 42a–9–203 (1997).